UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

PAMELA ESBERGER,                    )
                                    )
                                    )
        Plaintiff,                  )
                                    )    Civil No. 3:13-cv-0744
v.                                  )    Judge Sharp
                                    )
WILLIAMSON COUNTY                   )
GOVERNMENT,                         )
                                    )
        Defendant.                  )

## MEMORANDUM

Plaintiff's complaint before this Court alleges unlawful discrimination on the basis of disability and age in violation of the American's with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., the Tennessee Disability Act ("TDA"), Tenn. Code Ann. § 8-50-103, 8-50-104., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 et seq., and Tennessee common law. (Docket No. 1). Defendant Williamson County Government ("Williamson County") has filed a Motion for Summary Judgment (Docket No. 24) on all claims in the complaint. This motion, for the reasons that follow, will be granted.

### I.  FACTUAL BACKGROUND

Plaintiff worked for Defendant Williamson County from May 10, 1999 to August 3, 2012. (Docket No. 31 ¶¶ 1, 28). Plaintiff was employed first as a Benefits Clerk and later as the New Hire Coordinator in the Benefits Department under supervisor Gina Cavanaugh. (Docket No. 31 ¶¶ 2-3). At the time of her termination, Plaintiff was 54 years old. (Docket No. 31 ¶ 73).

1

In June 2009, Plaintiff gave Cavanaugh a letter from her psychiatrist indicating that Plaintiff had been diagnosed with Attention Deficit Disorder ("ADD"). (Docket No. 31 ¶ 39). After Plaintiff disclosed her ADD, Mike Weber, the Human Resources Director, met with Plaintiff and Cavanaugh to discuss the diagnosis and potential for accommodations. (Docket No. 31 ¶ 40). During the meeting, Plaintiff requested patience from Defendant in dealing with her ADD. (Docket No. 31 ¶ 41). Mr. Weber told Plaintiff that she could request specific accommodations from him and he would undertake to make sure she got them. (Docket No. 31 ¶ 42).

On June 12, 2012, Charles Pareigis, an employee of a vendor of Defendant called The Drury Group[1], came to the Benefits Department to deliver packets of information that Plaintiff had requested. (Docket No. 31 ¶¶ 4-5). While delivering the packets, Pareigis made a comment to Plaintiff's co-worker, Mary Wallace, who relayed it to Plaintiff in an instant message as follows:

> [Pariegis] [a]sked me to tell you, 'that he left some packets on your counter and he felt that would be enough to last you for a while so you will quit bugging him everyday' he asked that I tell you exactly like that.

(Docket No. 31 ¶ 7). Although Plaintiff and Pareigis had a long working relationship in which Plaintiff actively participated in light-hearted banter and joking with Pareigis, Plaintiff took offense to Pareigis's comment and reported it to Cavanaugh. (Docket No. 31 ¶ 8). Cavanaugh responded by instructing Plaintiff to only engage in professional communications with Drury Group employees, including Pareigis. (Docket No. 31 ¶ 10). Cavanaugh asked Pareigis not to discuss the June 12, 2012 incident with Plaintiff. (Docket No. 31 ¶ 12).

On August 2, 2012, Plaintiff attended an orientation on behalf of Defendant at Franklin High School with Pareigis and Roxanne Sanders, another Drury Group employee. (Docket No. 31 ¶

---

[1] The Drury Group worked with Defendant as a broker consultant for voluntary employee benefits. (Docket No. 31 ¶ 4).

15). There were vendors, school system employees and other individuals at the event. (Docket No. 31 ¶ 17). During the event, Pareigis stepped away from the Drury Group table. While Pareigis was away, Plaintiff asked Sanders if she thought it would be okay for her to discuss the June 2012 incident with Pareigis. (Docket No. 31 ¶ 19). Sanders told Plaintiff that she should not talk about it. (Id.) When Pareigis returned, Plaintiff initiated a conversation with him regarding the June 2012 incident in which she apologized for the fallout from her report.[2] (Docket No. 31 ¶ 20).

Later in the day on August 2, 2012, at the same Franklin High School event, Pareigis stepped away again. While Pareigis was away for the second time, Plaintiff engaged Sanders in a one-sided conversation about receiving vaginal massage treatment from her doctor. (Docket No. 31 ¶ 23). When Pareigis returned, Plaintiff continued to discuss the vaginal massages in detail, and explained that the county insurance paid for them. (Docket No. 31 ¶¶ 24-25).[3] Within an hour of the conversation ending, Pareigis called Cavanaugh from the location of the event. (Docket No. 31 ¶¶ 26). During the call, Pareigis reported Plaintiff's discussion regarding vaginal massages, expressed his displeasure that the county insurance was paying for them, and informed Cavanaugh that Plaintiff discussed the June 12, 2012 incident with him. (Docket No. 27-3 p. 88-89).

---

[2] Although both Sanders and Pareigis aver that Plaintiff initiated the conversation, Plaintiff testified that she didn't remember who started the dialog, but stated "I would doubt if [Pareigis] did." (Docket No. 31 ¶ 22).

[3] Although Plaintiff disputes these facts on the grounds that Pareigis' testimony contradicts them, the Court does not find that it does. Pareigis testified that upon his return to the group, Sanders and Plaintiff were having and continued to have a conversation about Plaintiff getting vaginal massages. (Docket No. 27-3 p. 82-83). Pareigis further testified that the vaginal massages were discussed in detail, the conversation "was pretty one-sided," and Plaintiff mentioned that "the county health insurance plan was paying for it." (Docket No. 27-3 p. 84). Plaintiff does not offer any other evidence to dispute these facts.

Cavanaugh came to the Franklin High School event that afternoon, sent Plaintiff back to the office, and took Plaintiff's place at the event. (Docket No. 31 ¶ 27). Plaintiff's employment with Defendant was terminated the following day on August 3, 2012. (Docket No. 31 ¶ 28).

Prior to the August 2, 2012 incident, other employees in the Benefits Department had reported to Cavanaugh that Plaintiff was discussing vaginal massages with them at work. (Docket No. 31 ¶ 30). Cavanaugh instructed Plaintiff not to discuss her vaginal massages at work, and Plaintiff apologized and indicated she would not discuss the topic anymore. (Docket No. 31 ¶ 31). During the course of her employment, Plaintiff had also been counselled for discussing personal issues and engaging in inappropriate behavior at work. (Docket No. 31 ¶ 29).

Plaintiff admits that her vaginal massages were not an appropriate topic of conversation to have with representatives of a Williamson County vendor in a professional environment. (Docket No. 31 ¶ 32) (Docket No. 27-2 p. 165). Plaintiff further admits that her discussion of vaginal massages was in direct contravention of Cavanaugh's instruction to discuss only professional matters with Drury Group representatives. (Docket No. 31 ¶ 33). Finally, Plaintiff admits she was terminated based on her initiation of a discussion about a specific subject after she was told not to discuss personal matters with members of the Drury Group. (Docket No. 27-2 ¶ p. 176). Plaintiff's Separation Notice lists "unprofessional conduct" as the reason for separation. (Docket No. 31 ¶ 62).

## II. ANALYSIS

A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, (1986). However, the nonmoving party must rely on more than "[c]onclusory assertions, supported only by Plaintiff's own opinions." Arendale v. City of Memphis, 519 F.3d 587, 605 (6th Cir. 2008). Rather, Plaintiffs must "set out specific facts showing a genuine issue for trial." Harvey v. Campbell County, Tenn., 453 Fed. Appx. 557, 561 (6th Cir. 2011).

   a. **ADEA/THRA claims**

Plaintiff brings both ADEA and THRA claims against Defendant. The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a). The analysis for Plaintiff's THRA claim is identical to the analysis for an age discrimination claim brought under the ADEA. Scola v. Publix Super Markets, Inc., 902 F. Supp. 2d 1083, 1091 (E.D. Tenn. 2012) (citing 29 U.S.C. §§ 623 et seq.). See also, Bender v. Hecht's Dep't Stores, 455 F.3d 612, 620 (6th Cir.2006) ("We apply the same analysis to age-discrimination claims brought under the THRA as those brought under the ADEA.") Both prohibit employers from discriminating against an employee because of that employee's age. Id. (citing 29 U.S.C. § 623(a); Tenn.Code. Ann. § 4–21–401(a)(1)).

An employee can establish an age discrimination case by either direct or circumstantial evidence. Martin v. Toledo Cardiology Consultants, Inc., 548 F.3d 405, 410 (6th Cir. 2008). To establish a *prima facie* case of age discrimination using circumstantial evidence, the plaintiff

must show that 1) she was a member of the protected class, 2) she was subject to an adverse employment action, 3) she was qualified for the position, and 4) she was replaced by a younger worker or treated differently from similarly situated employees outside the protected class. Id. at 349. In this case, Plaintiff does not offer any direct evidence of age discrimination, and, as a result, the court utilizes the circumstantial evidence analysis.

Plaintiff has failed to establish her age discrimination claim. Specifically, she has failed to show that a younger employee replaced her. Plaintiff was replaced by Sandra Foster, who is almost 14 months older than Plaintiff. (Docket No. 31 ¶¶ 67-68, 73-74). Additionally, Plaintiff does not offer any evidence that Defendant treated younger, similarly–situated employees differently than her. Although Plaintiff alleges that other employees were treated more favorably, Plaintiff does not allege that said employees were younger than her, and the record is devoid of any references to the ages of similarly-situated employees.

Indeed, the only evidence Plaintiff offers to show that she was discriminated against due to her age are conclusory allegations based on Plaintiff's subjective belief that Defendant engages in age-based discrimination. For example, Plaintiff contends that Cavanaugh terminated Plaintiff following her decision not to retire at age 55, stating

> And I think [Cavanaugh] had a little bug in her ear telling her we only have X amount of months until she leaves. And then when I said I was not going to leave in February it kind of like got a few people upset.

(Docket No. 31 ¶ 66). These allegations are speculative and insufficient to withstand a motion for summary judgment. See Watkins v. New Albany Plain Local Schools, 711 F.Supp. 817, 832 (S.D. Ohio 2010) (citing Bryant v. Commonwealth of Kentucky, 490 F.2d 1273, 1274 (6th Cir.

1974) ("Speculation ungrounded in fact is insufficient to withstand a motion for summary judgment.")

Because Plaintiff was not replaced by a younger employee and Plaintiff did not show that Defendant treated younger, similarly situated employees more favorably than her, Plaintiff has failed to establish a *prima facie* case of age discrimination. As a result, her claims under the ADEA and THRA will be dismissed.

   b. **ADA/TDA Claims**

Title I of the ADA provides that a covered employer "shall [not] discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." Whitfield, v. Tennessee, 639 F.3d 253, 258 (6th Cir. 2011) (citing 42 U.S.C. § 12112(a)). The TDA prohibits "discrimination in the hiring, firing and other terms and conditions of employment" of state employees and private employers "based solely upon any physical, mental or visual disability of the applicant." Tenn. Code Ann. § 8-50-103. The same general elements apply whether the claim is under the ADA or the TDA; however, the TDA does not require that employers make a reasonable accommodation for a disability. See Dunavant v. Frito Lay, 2013 WL 816673, at *6 (M.D. Tenn. Mar. 5, 2013) (citing Cadenas-Meade v. Pfizer, Inc., 510 Fed. Appx. 367, 369 & fn. 2-3 (6th Cir. 2013)). Plaintiff's complaint alleges disability discrimination for failure to make reasonable accommodations and disparate treatment. The court will discuss each claim in turn.

**Failure to Accommodate**

In her complaint, Plaintiff alleges disability discrimination based on "Defendants [sic] fail[ure] to make reasonable accommodations to Plaintiff" even though Defendant knew of

7

Plaintiff's disability. (Docket No. 1 ¶ 47). "[A]n employer's failure to provide a reasonable accommodation can constitute the type of unlawful discrimination barred by the [ADA]." <u>Cash v. Siegel-Robert, Inc.</u>, 548 Fed. Appx. 330, 335 (6th Cir. 2013) (citing <u>Keith v. Cnty. of Oakland</u>, 703 F.3d 918, 923 (6th Cir. 2013)). In establishing a failure to accommodate claim, the plaintiff bears the burden of establishing she is disabled as defined in the ADA, and also "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." <u>Johnson v. Cleveland City School Dist.</u>, 344 Fed. Appx. 104, 111 (citing <u>Kleiber v. Honda of Am. Mfg., Inc.</u>, 485 F.3d 862, 870 (6th Cir. 2007)). The plaintiff must "show that she requested the specific accommodation; a plaintiff may not rely on accommodations that she did not request." <u>Steward v. New Chrysler</u>, 415 Fed. Appx. 632, 642 (6th Cir. 2011). "The burden of proof then shifts to the defendant to show that the accommodation would be an undue hardship." <u>Johnson</u>, 344 Fed. Appx. at 111 (citing <u>Talley Family Dollar Stores of Ohio, Inc.</u>, 542 F.3d 1099, 1108 (6th Cir. 2008).

Here, Plaintiff has failed to establish a reasonable accommodation claim because the undisputed facts show that she did not propose any reasonable accommodations. Plaintiff recounted her meeting with Weber and Cavanaugh to discuss disability accommodations as follows:

> He said, what can we do, because by law we have to ask you; We have to provide you with tools for anything you need to help you do your work. And he was very-he was very understanding of the law and all kinds of – and like I told him, I said, <u>I don't need any tools. Tools, like, I don't need a special chair or, you know, a computer or something.</u> I – what I need are patience. I need people that have patience with me. Just to understand, my exact word, I just need patience…My- my co-workers to have patience that I'm trying, but when you have to relearn how to think, it's just – it's going to take some time. It's not an overnight thing, they give you medication, whup, you're cured, you can walk away. <u>But I did ask</u>

<blockquote><u>specifically for patience - …and that's all I've ever asked for. I didn't ask for anything – special equipment.</u> I just want people to understand that, you know, I'm doing my best."</blockquote>

(Docket No. 31 ¶ 41) (emphasis added). When asked whether she remembered anything else about her discussion with Cavanaugh and Weber regarding her diagnosis, Plaintiff stated, "[Weber] was very accommodating. You know he asked me is there anything that I need and I – I just need patience." (Docket No. 31 ¶ 44) (Docket No. 27-1 p. 107). From Plaintiff's testimony, it appears that she did not request any accommodations for her ADD except patience. A request for patience, without more, does not constitute a request for a reasonable accommodation. See <u>Miron v. Minnesota Mining and Mfg. Co.</u>, 2001 WL 1663870, at *5 (citing <u>Scott v. American Airlines, Inc.</u>, 1997 WL 278129, at *1, *5 (N.D. Tex. May 15, 1997) (finding that the plaintiff's request for "patience and understanding" did not constitute a request for an accommodation). <u>See also</u>, <u>K.H. v. Vincent Smith School</u>, 2006 WL 845385, at *8 (E.D.N.Y. Mar. 29, 2006) (finding that a school's refusal to discuss accommodating the plaintiff did not violate the ADA where the request for accommodation was that they "they needed to have more patience and more tolerance" because the "precise contours of the proposed accommodation [were] difficult to pin down.")

Additionally, Weber told Plaintiff that if she ever needed specific accommodations, she could discuss it with him and he would take steps to meet her requests. (Docket No. 31 ¶ 42). There is no evidence in the record that Plaintiff ever made requests for accommodations to Weber, or submitted any documentation to Defendant related to accommodations or proposed accommodations from her doctor. (Docket No. 31 ¶ 43).

Notwithstanding these facts, Plaintiff contends she made several oral requests for reasonable accommodation to Cavanaugh including a request to have information repeated to her by a co-

9

worker, a request to take notes, and a request for a quiet workplace. Plaintiff's claim fails as to each alleged request, however, because she either fails to offer evidence that she requested the action as a reasonable accomodation or she admits that her request was fulfilled.

With regard to note-taking, Plaintiff admitted that she took notes before her ADD diagnosis and at various times during her employment with Defendant. (Docket Nos. 27-1 p. 82 & 27-2). Plaintiff does not assert that Defendant prevented her from taking notes at any time during her employment; rather, Plaintiff contends that Cavanaugh expressed frustration regarding Plaintiff's note-taking. There is no evidence that Cavanaugh's alleged frustration precluded Plaintiff from taking notes. In fact, Plaintiff produced many pages of notes about work during discovery in this litigation. (Docket No. 27-2 Ex. 3). Without any facts showing that Plaintiff's alleged request to take notes was denied, Plaintiff's failure to accommodate claim cannot be established.

Additionally, Plaintiff admits that she did not communicate to Weber or Cavanaugh that her note-taking functioned to accommodate her disability.[4] (Docket No. 27-2 p. 125). As discussed above, without said communication, there can be no failure to accomodate. Cash v. Siegel-Robert, Inc., 548 Fed. Appx. 330, 335 (6th Cir. 2013) (a failure to accommodate plaintiff bears the initial burden to propose an accommodation). See also, Parsons v. Auto Club Group, 565 Fed. Appx. 446, 448-49 (6th Cir. 2014) (finding that the employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accomodation).

With regard to Plaintiff's request for a quiet work space, Plaintiff argues that Defendant's actions in moving Plaintiff's work space from the back of the office to the front of the office

---

[4] After Plaintiff mentioned that Cavanaugh would become annoyed with Plaintiff's note-taking, Defense counsel asked her whether she communicated to Weber or Cavanaugh that she needed to take notes to retain information. Plaintiff responded, "No, I don't think. I don't think we got that detailed." (Docket No. 27-2 p. 125).

10

exacerbated the effects of her ADD and made it difficult for Plaintiff to get her work done. Plaintiff contends that she had previously told Defendant she preferred working in the back of the office because being in the front made it "so hard to get your work done because you are constantly being disrupted…." (Docket No. 27-2 p. 145-46). Thus, according to Plaintiff, Defendant should have known Plaintiff would be negatively affected by a move to the front.

Plaintiff's allegations do not require the conclusion that Defendant failed to grant a reasonable request for accommodation. Conspicuously missing from Plaintiff's argument is any evidence or allegation that she requested a quiet work space, or objected to being moved to the front of the office. In fact, it is undisputed that Plaintiff did not object to the move or request that she be moved to the back of the office to accommodate her ADD. (Docket No. 31 ¶¶ 57-59). As explained above, Plaintiff must make a proposal or request for accomodation in order to establish a failure to accommodate claim.

Finally, as to Plaintiff's request to have information repeated to her by a co-worker, Plaintiff admits that her request was fulfilled. Specifically, Plaintiff testified that she "asked [Cavanaugh]—not for someone to do my job, but to help me if I don't – again, if I don't understand." (Docket No. 27-1 p. 108). Plaintiff further testified that Cavanaugh responded by indicating Plaintiff could ask her co-workers questions to help her remember or understand so long as they did not do Plaintiff's job for her. (Docket No. 27-1 p. 108-110). Because Plaintiff's request was fulfilled, she has not established a failure to accommodate claim. See Newcomb, 2013 WL 1874257, at *5 (where the plaintiff admitted that the only specific request for accommodation she made was granted, the possibility of a failure to accommodate claim was foreclosed).

11

In Plaintiff's response to Defendant's motion for summary judgment, she argues "Plaintiff could have been reasonably accommodated but for the employer's lack of good faith." (Docket No. 30 p. 22). To the extent that Plaintiff is asserting Defendant failed to participate in the ADA-required interactive process with Plaintiff, the Court finds Plaintiff's argument without merit. The ADA's regulations indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." Kleiber, 485 F.3d at 871 (citing 29 C.F.R. § 1630.2 (o)(3)). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." Id. Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." Kleiber, 485, F.3d at 871 (citing Barnett v. U.S. Air., Inc., 228 F.3d 1105, 1114 (9th Cir. 2000)).

Here, it is undisputed that, upon disclosure of her disability, Defendant's human resources representative, Weber, met with Plaintiff and her supervisor to discuss her ADD diagnosis and reasonable accommodations. Plaintiff stated that, during this meeting, "[Weber] was very accommodating." (Docket No. 31 ¶ 44). Weber asked Plaintiff to let him know about specific accommodations she required regarding her disability and he would take steps to ensure they were met. These facts show that Defendant made a good-faith effort to participate in the interactive process required under the ADA to assist Plaintiff in seeking accomodation.

Accordingly, Plaintiff has failed to establish a failure to accommodate claim under the ADA, and Plaintiff's claim in that regard will be dismissed.

**Disparate Treatment**

A plaintiff may base a disability discrimination case on direct or indirect evidence. Hedrick v. W. Reserve Care Sys., 355 F.3d 444, 452 (6th Cir. 2004) (citing Monette v. Electronic Data Sys. Corp., 90 F.3d 1173, 1178 (6th Cir. 1996)). In this case, Plaintiff does not offer any direct evidence of disability discrimination. Accordingly, her disparate treatment claim will be analyzed under the indirect evidence framework. In the Sixth Circuit, a prima facie case of disability discrimination based on indirect evidence requires the plaintiff to show that: "1) he or she is disabled; 2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the disabled individual was replaced." Newcomb, 2013 WL 1874257, at *5 (citing Whitfield v. Tennessee, 639 F.3d 253, 258-59 (6th Cir. 2011)). "[O]nce a plaintiff makes out a prima facie case, the burden shifts to the defendant to articulate a non-discriminatory explanation for the employment action, and if the defendant does so, the burden shifts back to the plaintiff to prove that the defendant's explanation is pretextual." Id. "A plaintiff can demonstrate pretext by showing that the defendant's proffered reason for its adverse employment action (1) has no basis in fact, (2) did not actually motivate the defendant's action, or (3) was insufficient to motivate the defendant's action." Newcomb, 2013 WL 1874257, at *8 (citing Burress v. City of Franklin, Tenn., 809 F. Supp.2d 795, 814 (M.D. Tenn. 2011)).

Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination is her unprofessional and insubordinate conduct on August 2, 2012 at the Franklin High School event. This conduct includes Plaintiff's actions in initiating a conversation with Pariegis about the June 2012 interpersonal conflict between them, and in engaging Pariegis and Sanders in a

13

conversation about vaginal massages after Plaintiff had been instructed to only engage in professional communications with vendor representatives.

Plaintiff contends Defendant's legitimate reason is unworthy of belief and insufficient to motivate Plaintiff's termination because the conversation was a "private conversation" between only Plaintiff, Pariegis and Sanders and did not have a significant effect on Pariegis or any employees of Defendant. Plaintiff argues that Pariegis was only present for part of the conversation, thought Plaintiff "was kidding," and didn't recall much at all of the discussion. (Docket No. 30 p. 25). Essentially, Plaintiff's position is that because the vaginal massage discussion was a private conversation among only three individuals - one of whom cannot recall a significant portion of the conversation and none of whom are actual employees of Defendant (besides Plaintiff) - the negative effects of Plaintiff's inappropriate behavior were minimal, insufficient to motivate Plaintiff's termination, and evidence that Defendant's proffered nondiscriminatory reason for termination has no basis in fact.

However, the record does not support Plaintiff's contentions. Pariegis testified that Plaintiff and Sanders had a conversation in his presence about Plaintiff's vaginal massages. He stated that Plaintiff described the vaginal massages in detail, and that "it was weird for me to be sitting there hearing [Plaintiff] talk about vaginal massage." (Docket No. 27-3 p. 82). Clearly, Pariegis was a party to and affected by Plaintiff's discussion.

It is also undisputed that Plaintiff attended the Franklin High School event as a representative of Defendant, and that vendors, school system employees and other individuals were present at the event. (Docket No. 31 ¶ 17). Additionally, Pariegis and Sanders were employees of the Drury Group, which had a professional relationship with Defendant. (Docket No. 31 ¶ 4). As a

result, Plaintiff's discussion with Pariegis and Sanders at the Franklin High School event cannot be characterized as a "private conversation" without any professional ramifications.

Furthermore, Plaintiff's position ignores the fact that Plaintiff's terminable actions included repeated disobedience. Prior to the Franklin High school event, Cavanaugh had instructed Plaintiff not to discuss her vaginal massages at work, had been counselled against discussion of personal issues at work, and had been told to engage only in professional communications with Drury Group employees. Instead of following her supervisor's instructions, Plaintiff not only engaged in an inappropriate conversation about her massages, but also initiated a conversation with Pariegis regarding their June 2012 interpersonal conflict.[5] Plaintiff's insubordinate actions constitute legitimate reasons for termination. See Newcomb, 2013 WL 1874257, at *9 (citing Tibbs v. Calvary United Methodist Church, 505 Fed. Appx. 508, 513 (6th Cir. Nov. 20, 2012) ("It is well settled that insubordination can constitute legitimate reasons for termination.")). The Court finds that Plaintiff's inappropriate behavior combined with her insubordination constitute sufficient grounds for termination.

Finally, Plaintiff argues the following:

> Cavanaugh deliberately placed Plaintiff in a situation that could have (and did) exacerbated [sic] animosity held over from the June 2012 packet-delivery message. Her assigning Plaintiff to work alongside Pareigis provided the match; then she just had to stand back and watch the kindling enflame after his angry over-reaction to learning not of Plaintiff's medical procedure but of her insurance reimbursement for same.

---

[5] Plaintiff notes in her Response that there is no documentation in Plaintiff's personnel file documenting Plaintiff's prior inappropriate behavior or the June 2012 incident involving Pariegis; however, the Court finds this irrelevant because these facts are not in dispute, and Plaintiff admitted to the material facts surrounding the June 2012 incident in her deposition. (Docket No. 31 ¶¶ 5-10; 29-30).

(Docket No. 30 p. 25). The Court finds that these statements are based on speculation and unsubstantiated claims. Plaintiff has absolutely no basis in fact for alleging that Cavanaugh intentionally constructed a scenario that would cause Plaintiff to engage in unprofessional and inappropriate conduct in order to lay the groundwork for Plaintiff's termination. Such speculation is insufficient to withstand a motion for summary judgment. See Watkins, 711 F.Supp. 817, 832 (S.D. Ohio 2010) (citing Bryant, 490 F.2d 1273, 1274 (6th Cir. 1974) ("Speculation ungrounded in fact is insufficient to withstand a motion for summary judgment.")

The Court finds that Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff is more than adequately supported by the record. It is undisputed that Plaintiff initiated a conversation with Pareigis about the June 2012 incident at the Franklin High School event and, later the same day, engaged Sanders and Pareigis in a conversation about her massages. Plaintiff admits her actions were inappropriate and in direct contravention of her supervisor's specific instructions not to engage in any unprofessional communications with Drury Group representatives. (Docket No. 31 ¶ 32-33). When the communications were reported to Cavanaugh, she took Plaintiff's place at the event and sent Plaintiff back to the office. (Docket No. 31 ¶ 27). Plaintiff was terminated the following day (Docket No. 31 ¶ 28) for "unprofessional conduct." (Docket No. 31 ¶ 62). Finally, Plaintiff admits she was terminated based on her actions in bringing up a specific subject with Pareigis and Sanders after she was told not to discuss personal matters with Drury Group representatives. (Docket No. 27-2 p. 176).

Because Plaintiff has failed to show that Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination was a mere pretext for discrimination and has failed to establish her failure to accommodate claim, Plaintiff's claims under the ADA and TDA will be dismissed.

    **c. Tennessee Common Law**

16

Plaintiff's complaint alleges that "Defendants' conduct violated established common law of the State of Tennessee when Defendant retaliated against Plaintiff by terminating her position after she made requests for reasonable accommodations." (Docket No. 1 ¶ 68). Defendant argues that Plaintiff's claim should be dismissed because the common law tort of retaliatory discharge is preempted by the THRA. See Pigott v. Battleground Academy, 909 F.Supp.2d 949, 967 (M.D. Tenn. 2012) (noting that the THRA makes it a discriminatory practice to retaliate against someone who has opposed a practice declared discriminatory by statute, and finding that the common law tort of retaliatory discharge is preempted by the THRA).

The Court agrees, and finds that Plaintiff's common law retaliatory discharge claim is preempted by the THRA and TDA. Although disability discrimination is primarily addressed under the Tennessee Disability Act, "the TDA works in conjunction with the THRA to provide a cause of action for disability discrimination." Smiley v. Cumberland Mach. Co., 2014 WL 3112371, at *2 (M.D. Tenn. July 7, 2014) (citing Perlberg v. Brencor Asset Mgmt., 63 S.W.3d 390, 394 (Tenn.Ct.App.2001)). See also, Barnes v. Goodyear Tire & Rubber Co., 48 S.W.3d 698, 705 (Tenn. 2000) (citing Forbes v. Wilson County Emergency, 966 S.W.2d 417, 420 (Tenn.1998)) ("The THA embodies the definitions and remedies provided by the Tennessee Human Rights Act ("THRA")). Thus, Plaintiff's common law retaliatory discharge claim arising out of disability discrimination is preempted by Tennessee statute and will be dismissed.

### III. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Docket No. 24) will be granted with respect to all of Plaintiff's claims. This action will be dismissed with prejudice.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE